Case number 15-5330 et al. SNR Wireless Licenseco, LLC, Appellant v. Federal Communications Commission. Ms. Stetson for the appellants. Ms. Flood for the appellate. Good morning, Your Honors. May it please the Court. My name is Kate Stetson. I represent the petitioners. It is a basic administrative law principle and one that this Court has applied many times before. That before an agency can punish someone for violating its standards, it needs to give that someone fair notice of what those standards are. In the words of this Court, someone looking at those standards needs to be able to identify with ascertainable certainty the standards with which the agency expects parties to conform. And that's from Trinity Broadcasting. The Commission did not do that here with respect to the control standard that it applied to these two petitioners, and its rejection of the petitioner's application for bidding credits and its imposition of default penalties should be reversed. In fact, to the extent that anything was ascertainably certain, it was that the Wireless Bureau, the Bureau responsible for administrating auctions, deciding designated entity applications, and everything that goes along with that, had approved the very provisions that were at issue in these two designated entity applications. The Wireless Bureau, in 159 out of 160 prior DE applications, had been the final decider. So just for context, when these entities are determining whether or not to apply for DE status, one of the things that they, of course, are required to do is to consult the regulations. The regulations, however, just say control is decided on a case-by-case basis. So the next question is, what are the next best pieces of information that those DE, potential DEs have, in order to make sure that they stay on the right side of the control line? There are two cases that the Commission would prefer us only to look at. That's Baker Creek and Intermountain Microwave from 1998 and 1963, respectively. But there are also those 150 other DE applications that the Bureau approved. So in this case, as in many other cases, the DE applicants specifically modeled their applications on prior approved applications. They specifically modeled every single provision, in fact, on a prior approved application. And that's why, at the end of our brief, we include a rather remarkable appendix. And the appendix sets forth in detail every single provision with which the FCC took issue and describes where in prior agreements, at least in some prior agreements, and there are more on that in a minute, where in those prior agreements those provisions were found. If I understand the Commission, and I'm not sure I do at all, to the extent that it regards the Bureau precedences of any interest, its argument is that here provisions which are seen in isolation in other cases are combined to make a fatal package. And second, it argues that the sums involved for this expanse of spectrum is so large that the credit position of the applicants would be such that they would be in a unique, at least previously unparalleled, position of dependence on DISH. So let me take those in reverse order, if I could, Judge Williams. First, with respect to the sums involved, it is, I think, a significant logical fallacy to make control turn on the sums involved when you're talking about an auction because it begs the question, at which point in the auction during the bidding did the sum involved get too big? This also is not the first case in which there have been huge sums involved. It came as no surprise to the Commission that the sum involved numbered in the billions of dollars. The Commission had conservatively estimated this auction to pull in about $10 billion to $15 billion. Industry had estimated it to pull in about $20 billion or more, and it came in at $41 billion to the Treasury. But the idea that control at some point tips from permissible to impermissible at some point during the auction when the bids get too large is a fallacy. More to the point, Ms. Kessler. Ms. Kessler, it's not really a fallacy. It goes to independence or not. It goes to control in the sense that if you had independent small entities bidding and they weren't controlled by a larger firm, they would have to slow down their bidding when they became in a position that they themselves, as a business matter, would feel they were in over their head in terms of credit. Whereas here they didn't because there was DISH, and DISH was, in fact, in a position to reap the benefits. To begin with, Judge Pillard, DISH was not a bottomless pocket. There was, in fact, a limit that these designated entities understood. But the Commission has previously said, both in its fifth Memorandum, Opinion, and Order, which I would commend to you to read closely, particularly paragraphs 81 and 94 and 95, the fifth M.O. and O. says, among other things, the fact that there is an investor contributing equity to a designated entity, in fact, is what the Commission wants. It is the way that these designated entities are able to compete nationally for Spectrum. Of course, but that doesn't mean necessarily that scale wouldn't be a factor that would affect the control inquiry. I still have to resist, I think, the premise, Judge Pillard, because if you have two designated entities that, in this case, did contribute significant equity, and we made that point in our briefs, and you have two DEs that actually have more equity stake than previous DEs in terms of a percentage, the idea that DISH could control simply because the sum is larger, even if the percentage of equity owned by these DEs is actually larger than past DEs, that makes no sense under a control principle. The other way to look at this, and the reason that I started talking about context in terms of what these DEs understood before the auction, is understand that this control decision, the decision that the FCC made to deny bidding credits occurred after the auction, after these entities had bid for and won billions of dollars in Spectrum, and importantly, after they were essentially handcuffed to those bids. They could not walk away from those bids without incurring, as we saw, significant penalties for doing so. So the idea that the agency could impose a control standard that somehow materializes in the middle of that auction process to find that at the end of that auction process, these DEs were not entitled to their DE status, that's the logical fallacy. And it's the reason that in prior DE situations, in all of those other applications I cited, no matter what the size of the bid involved, sometimes numbering in the billions of dollars again, in the case of, for example, Alaska Native Wireless, there never was a situation where the commission, even so much as cautioned, you know, these bids are getting a little bit big. We really have to put a cap on DEs. They did so now. They did so in the new rules. But that, in a way, just proves our point. No one looking at the control standard as it had been articulated and applied by the commission and the Bureau would have understood that there was a tipping point where the bids just got too big. SNR and North Star were not providing service before they started bidding in this auction. Is that right? That's correct. And about how long does it take entities like these two entities in the position that they were in to build out and start providing services in a national network? There usually is a build-out, I think, timing requirement associated with the spectrum, but I have two other answers, if I may, Judge Pillard. One of them is it's very common for an entity, including a DE and sometimes including a major entity, to create a new company before an auction process is held. But more to the point, these two DEs, SNR and North Star, were not new to this process. North Star is an entity ultimately controlled by Doyon, which is an Alaska-native corporation that has been in this business for several decades at this point. And SNR is controlled by John Maleta, who used to run the Wireless Bureau. So this is not a situation where you have, as was the case, say, in Ellis Thompson, a retired welder winning a license in a lottery who hired someone to manage his, to operate and run and build and manage his wireless license and still was found to exercise significant control. So is it your position that it doesn't matter whether these two companies are capable of building out, providing service, and being in a position to actually profit from that business to a point where they could pay back DISH? That's not part of the inquiry in your view. Well, it's never been part of the commission's inquiry, more importantly, that the entity bidding on and winning the license is the one that does the work. That's why the commission refers to this as a turnkey operation. Turnkey operations have been approved multiple times before, including in that Ellis Thompson case. And as to that, by the way, the Ellis Thompson case on which the commission and the Bureau relies in Alaska Native Wireless, among other things, is the one found in 10 FCC record. The commission's brief cites to 9 FCC record. It's the subsequent ALJ opinion that supplies all of the analysis of the patrol standard that was ultimately used in Alaska Native Wireless. But the reason that the commission doesn't dictate that a license has to somehow operate the facility is for the same reason that the commission that I mentioned before, the commission has made it very clear that in order for these designated entities to compete, they need large investors. That is something the memorandum opinion and order made very clear. And just to return to that, the memorandum opinion and order explains that passive investors, investors like Dish here, may permissibly insist, and I'm reading now, on a decision-making role in major corporate decisions that fundamentally affect their interests as shareholders. So this isn't, I think as the commission would have it, an instance where these two designated entities were somehow referring to some one-off instance where some other application got approved in all of its particulars, and those particulars are applied here. This is the principle that the commission articulated, and it's the principle that the commission followed in Alaska Native Wireless and in Baker Creek, and it's the principle that these two DEs followed when they very carefully and sensibly, given the amount of money involved, looked to the best available information they had in order to craft their agreements. They looked to the information that was publicly available, including 80-some-odd page summaries of agreements that had been found to pass the control standard. In those earlier instances, those 159 other cases where the Bureau approved DE applications. It is not sensible, I think, for the commission to suggest that the only things that these investors could look at when they are about to invest billions of dollars in building out wireless spectrum nationally are a regulation that says case-by-case basis, a 1998 case, and a 1963 case involving a television broadcaster. So just circling back, it's your position, I gather, in response to my question, that it doesn't matter how long it might take these entities to actually become profitable service providers because that's not relevant under the FCC's analysis? I think what matters under the FCC's analysis is, does the investor have a role in decision-making that protects its investment? Because otherwise, why would a large investor invest in a small entity? That's the commission's point. Does the investor have a role that protects its investment? You mean DISH clearly has a role. Yes, that's the commission's point. There's no question that DISH has a role. I think the question for you is, what shows any independence on the part of S&R or Northstar? What shows them to not be controlled? Oh, I think if you were to take the Baker Creek analysis and place it next to this case and have, by the way, the memorandum of opinion and order handy too, this investor did not have veto power over the budget. It did not have control over day-to-day operations. The DEs set the parameters for day-to-day operations just like in Ellis Thompson, just like in Alaska Native Wireless, just like in Denali. The investors could not be fired, could be fired at will, couldn't just be fired for cause. There is a litany of instances where this investor essentially was not controlling the show. The DEs were controlling the show. They were the ones who set the budget. They were the ones who dictated the management. They were the ones who dictated the policies and procedures. They were the ones with employment authority. And the agreements in this case make that very clear. So the idea that the commission could go back into those agreements and say, well, but the money is so big, and also there's this interoperability issue, which, by the way, the commission mandated, and therefore these two DEs are somehow in cahoots with DISH such that DISH is controlling them. That is a logical leap that can't be supported. What about the bidding behavior of these two entities where, unless they were controlled by DISH, I find it hard to explain why two independent, non-controlled entities that would have shifted an $11 million benefit in the middle of the bidding, it seems like they're operating interchangeably as if it doesn't matter which one of them wins the spectrum. To begin with, Judge Pillard, that's the way joint bidding works. Whenever you decide and agree and publish your agreement, by the way, to the commission, that you're going to coordinate your bids, one of the things that's expected, particularly if your coordinated intent is to build out a nationwide spectrum, is that there will be give and take among those joint bidders. This agreement was published to the FCC. The FCC actually was quite candid about that. It acknowledged that these two bidders and DISH did not run afoul of any of the FCC's joint bidding rules. So the idea that the inquiry, the FCC sees it not as an independent violation of joint bidding rules, but as an indicium that they were controlled by DISH, and I think that's a separate question, is it not? Well, it's a separate question, but it's one that doesn't follow from the premise. I think that's the problem. The fact that these two bidders bid on certain licenses, and in one instance that you mentioned decided to give back a license for a default penalty of $11 million, that happens all the time in this auction process. This auction has – Is there somewhere in the record that shows these two entities did have a joint venture or a shared bidding agreement? Yes. Yes, I can cite you to the joint appendix page. It would be helpful. I will, but the point is, too, the joint bidding agreement looks exactly like the joint bidding agreements that the Commission has countenanced over and over again. And more to this point, never in 159 or 60 prior instances has the Commission ever indicated that joint bidding somehow bespeaks control, which is understandable. The thing that joint bidding indicates is joint bidding, coordinated bidding. So all of these questions about size and about joint bidding, all of them just beg the question that I began with, which is how did the Commission, if it did, make its control standard ascertainably clear to these petitioners, such that they could be punished to the tune of forfeiting billions of dollars of spectrum and losing their DE status in order – because they were found not to comply with those control standards? There is nothing in the prior precedents that indicates that any of these standards that the Commission is now applying and which the Commission has now introduced in its new rules somehow should have put these petitioners on notice that their DE applications, which were modeled precisely on past ones, somehow wouldn't pass muster under the control standard. Counsel, when I asked you a sort of double-barreled question, you chose to take the second barrel first. Do you have a word on the first barrel, the Commission's reliance on combination of individually bureau-approved provisions? So two words on the first barrel, and thank you, Judge Williams. The first is, with respect to that combination, it's the same combination that was found in Alaska Native Wireless. The Commission complains about the number of investor protections here. There were 17 in Alaska Native Wireless. The second is, the Commission can't avoid this ascertainable certainty standard by just saying, well, that's a totality of the circumstances, and this particular totality tipped the edge into control. That's not how it works, and it's not how it works in all of the prior ascertainable certainty cases, particularly when you have the situation that I mentioned earlier, which is that these designated entities bid and won billions of licenses, billions of dollars of licenses at an auction only to be told that they didn't satisfy the control standard. So if ever there were a case where a regulated entity needed ascertainable certainty in order to understand whether it would or would not run afoul of the control standard, it's in a circumstance where that standard is applied only after the fact and only after the bidder has committed those billions of dollars and only after it has incurred or would incur a penalty for withdrawing. That's why the totality of the circumstances idea simply doesn't hold up. If we agreed with you, would the proper solution be to order the Commission to provide an opportunity to cure? I think you need not even do that. That's an alternative argument that we have, and it's an argument, of course, that makes a great deal of sense based on what I just said, which is if you're going to have a regime, which the Commission does in every auction, where it engages in this modest short-form application before the auction but saves its detailed inquiry until after the auction, then provide the applicants an opportunity to cure. The Commission did that even in Baker Creek. What kind of activity on the part of these petitioners could possibly cure the control inquiry here? What could count as a cure? Judge Pillard, there are a number of things that have been found to be control issues that have subsequently been cured. So to take one example, there are some expenditure limits in this agreement. If the Commission concludes that that expenditure limit that requires the approval of the investor is too low, it can change the expenditure limit. That's why in past instances, and the Commission doesn't dispute this, in past instances, every time the Commission has had a problem, including all the way back to Baker Creek, it has asked the applicant to come in and supply additional information explaining its control arrangements. That's why the Commission does that, in order for these entities to be able to cure the control problem after they've already incurred these billions of dollars of licenses. So it could extend the time for these businesses before, rather than five years, make it longer before they have to, before DISH has an option to buy? I think there are any number of things that these entities and the Commission could negotiate. And I emphasize negotiation because that's what's occurred in every other instance where the control standard has been questioned. But, frankly, I don't think we even get to the cure issue, because I think the fundamental issue in this case is the one that I started with, which is was it right for the Commission to penalize these two DEs by denying them the bidding credits and by imposing those penalties on them when they had to forfeit their licenses, where the Commission hadn't articulated its control standard? That's actually not a cure question at all. That is a fundamental administrative procedure gaffe. And it's one that the Commission has no answer to. Do you think it's material whether they had a joint bidding agreement or also a joint venture or joint business plan? I don't think it's material. The fact is they had both and they disclosed both, and both have been disclosed and have been in existence in many, many, many prior past auctions, all the way back to the early 2000s. So the fact that they had, again, joint bidding arrangements is utterly irrelevant to the control standard. The fact that they had an agreement is the reason we're here, because the agreement, according to the FCC, triggered the control standard. Between the two entities, between SNR and NORSA, they also had a joint business agreement, not just a joint bidding. Also common and also the case in past auctions, multiple past auctions, auctions 35 and 58, which we say in our brief. If there are no further questions. All right. Thank you. May it please the Court, Maureen Fletcher of the Federal Communications Commission. I apologize. I have laryngitis. I'm going to do the best I can. Petitioners challenged charge denial of very small business bidding credits fails for two reasons. First of all, they did not rely on agreements filed with bidding credit applications that were granted. As we point out in our brief, what petitioners did is they cherry-picked terms from multiple agreements and in many instances amended those terms to make them more investment-friendly, so the Commission, either the Bureau or the full Commission, had ever seen and certainly not granted an application like petitioners. The Commission held it necessary, I take it out of candor, to say that it was completely disavowing the Bureau of Decisions in any event. I think there was a qualification there. In paragraphs 118 through 121 of the order, Your Honor, the Commissioner made the point that I did. The Commission had never seen agreements like petitioners before. Well, then there was no need, to the extent that that's true, and the Commission was ready to rest on that proposition, there would be no need to disavow. But there was no harm in disavowing, Your Honor. As we said, it's qualified. It says to the extent that this decision can be read to be inconsistent with prior Bureau, let me rephrase that, to the extent prior Bureau grants of applications can be read to be inconsistent with this order, we disavow them. That's belt and suspenders. But the Commission's primary analysis is in paragraph 118 through 121. That said, the Commission sees no reason to run from Comcast. Comcast establishes the bright-line rule that an agency is not bound to follow the decisions of its staff. Were we bound to follow the decisions of our staff? We weren't bound. I think it's not really the issue. The question is notice. That's correct, Your Honor. At least it certainly isn't clear from Comcast that the firm was required to plunk down any money, make any commitments of any kind, before getting Commission approval. Well, Your Honor, here petitioners did have prior notice of what was required of them. Let's talk about that for a second. Petitioners' counsel talks about the 1994 Memorandum of Opinion and Order. In that order, the Commission told bidding credit applicants, where there is a put in combination with other terms that forces the designated entity to sell its licenses, the Commission will find control. And as we explained in paragraph 105 of the order, that's exactly what we found here. The way the credit agreement was structured was in the fifth year, the petitioners have to start paying the principal of their $10 billion loans plus interest. At that point, they have two years to pay off the principal and interest, or they can exercise a put option that gives them a 30-day window to sell those licenses to DISH. Combine that with the interoperability restriction, which forces petitioners to wait for DISH to make a technology choice, which also means that they can't start building the networks required to provide service to get revenue to pay those loans. Was the Commission worried about that instance where the agreement called for the investor to be able to change the technology from time to time and the designated entity to follow along? That's a completely different circumstance. There you had a designated entity that entered into an interoperability commitment with another provider that was providing service. So on day one, that designated entity could start deploying a network, providing services, earning revenue. Subject to having the technology switched at the will of the investor. It could, Your Honor, but at the same time, the problem here is that DISH could fail to make a technology choice. It could decide not to make a technology choice for five years. At that point, the petitioners have no choice but to sell. But even if DISH does make a technology choice, Your Honor, it is simply implausible that these parties, starting from scratch, will be able to pay off $10 billion in loans plus interest in seven years. And I want to go back. If petitioners had only read – You talk about the largest sums involved, but I would think from the point of view of lenders, a key thing would be the relationship between the spectrum obtained and the cost of building out. And I think everything else being equal, that ratio would be roughly constant. Your Honor, we were not concerned for the size of the bid standing alone. I believe Petitioner's Counsel has mischaracterized that. The size of the bids affects things like the put, because where you have – And let me give you a good example. So if you go to pages 811 and 813 of Petitioner's Appendix, their argument is that they relied on – they structured their agreement based on the credit terms and the put option in Denali. As we point out in footnote 9 of our brief, the Denali transaction included one regional license and a net winning bid of $274 million, million with an M. Here, petitioners, their individual net bidding credits were about $4 and $5 billion. In other words, the Denali bid was less than 1% of their bids. Under the Denali arrangement, the designated entity had 10 years before it was required to start paying off the principal of this loan in interest, and only then could it exercise the put. Here, petitioners only have five years. So the way that the $13 billion factors in and the magnitude of the bid is that when you basically take their agreements, right, which were cherry-picked from terms in other agreements, made more restrictive here, and then you put on the $13 billion, the commission is faced with a circumstance it had never seen before. And analyzing the circumstances of this case, we clearly found that to exercise control over petitioners, and were we to give them a bidding credit, there would be unjust enrichment. Two questions. One is why not give them an opportunity to cure that by giving these entities a longer time to pay back, changing the put option? And or, other question, what's your best case that they had noticed that that would matter? First of all, the opportunity to cure. There's nothing in our rules, our orders, anywhere that provides petitioners an opportunity to cure. That's a bureau-level practice that does not bind the commission. It was reasonable for the commission here not to provide petitioners an opportunity to cure for two reasons. First of all, it would create a moral hazard. It would create a moral hazard, Your Honor. We would have a situation where bidding credit applicants would not have any incentive to comply with our control rules in the first instance. They could push the envelope, like petitioners did, and then expect the commission to negotiate with them on the back end. This is despite the fact that when petitioners placed their bids under our rules, this is rule 1.2104G2, they committed to paying the full amount of their bids, and they knew full well that bidding credit would be determined after the auction. Putting that aside, as the commission pointed out in 431, or footnote 431 of the order, under these circumstances, it really was implausible that they would be able to cure their problems. I mean, for example, in their reply brief, they say, well, you know. Just to interrupt you for a minute, you do, as I mentioned before, lay great stress on the idea of this combination of provisions that is fatal here. I don't seem to suggest an open avenue to cutting back on specific ones which create problems. But, Your Honor, I'm sorry to interrupt you, Your Honor. The problems are so pervasive. So if they fix the interoperability condition, you would still have the credit agreement and the put. So they would have to totally restructure their credit agreements. Then you would have to look to the investor protections. As we point out in the order and in our brief, Baker Creek set forth six typical investor protections which protect the investor's investment in the company. So that would be issuance of stock, or it would be a major expenditure. Here we saw investor protections which actually allowed DISH to micromanage petitioner's businesses. If petitioners wanted to go out and acquire a new spectrum, DISH could say no. If petitioners wanted to deviate more than 10% from a specific line item in their budget, DISH could say no. So it's understood here the designated entities have more control over their budget in the first instance. So the question of deviating 10% is less powerful. But that's one example, Your Honor. As we go on and on. You're going to say that for everything. Well, I am, because I am going to say that for everything. Because what about the spectrum? What about the spectrum acquisition? So even if I give you, Judge Williams, that they have more control? Is it very common in this situation for the designated entities to plunge into another spectrum acquisition? Well, Your Honor, it could be. To the extent that they're stretched. It could be, Your Honor. So look at Appendix Page K-4. Okay, so petitioners modeled the spectrum limitation on the Denali Agreement. Okay. In the Denali Agreement, and this makes sense, it says acquisition of any new spectrum in the area where Cricket or other partner operates or holds spectrum. Well, that makes sense. If your partner has spectrum someplace else, why would you want to duplicate? Well, here the petitioners made it more restrictive. If you look at their provision, it says acquisition of any new spectrum. And this kind of goes back to my larger point, which is that the commission had never seen these agreements before. These were new agreements. But it also gets back to my point with you, Judge Williams. You know, it's not one or two things here. Even if we don't. So, okay, we have to deal with the interoperability condition. Then we have to restructure their credit agreements and get rid of the put. Then we have to look at the investor protections. And by the way, Judge Williams, as we point out in the order, the other non-controlling investors in these companies didn't request the same level of investor protections as DISH. They settled for the six typical investor protections that we delineate in the Baker Creek decision, right? So you have that. So, I mean, it just goes on and on and on. And so you get into a situation where they would actually run afoul of our rules. Our rules, as we point out in our brief, require you to file essentially a perfect long-form application. You can make minor adjustments. If you get the address wrong, if you get the name of one of your principals wrong. But you can't go in and restructure the- This issue has been cured with much farther than that. Qualcomm, for example. That's incorrect, Your Honor. Petitioners in their opening brief cite four instances, all staff-level decisions, which were not bound to follow by Comcast for the proposition that there was a- I'm sorry. Clearcom. Clearcom. No, Your Honor. So Clearcom is very different. In the Clearcom case, we had a designated entity that had been operating for years. What happened was it sought to restructure itself. It accidentally ran afoul of the de facto control rules, and we allowed to fix that. And we were very clear in Clearcom that that was a one-time only decision. It's a lot of changes. Not any of those. Removal of an option to acquire controlling interests. Something parallel to that. Fairly radical change in the management agreement. That's one example. Even if you disagree with me on that, Your Honor, that's one example. That's one example. And there's no condition- Any kind of provision on any scale at all is just a question. It would turn the application into an amended application, and therefore- That's exactly right, and the Commission is allowed to do that because those are Bureau-level decisions that don't bind us. And so the question before the Court was, is it reasonable for the Commission, exercising its discretion to order its proceedings under 4I of the Act, to deny petitioners a second chance? And it is. If we are required to provide a petitioner like this, which has to engage in a wholesale restructuring of all of its agreements with its investor, we basically are in a situation where we are going to, on the back end, have to negotiate every bidding credit application. And, you know, as we pointed out- Well, maybe if you had clear rules, the problem would arise in the long run. Well, Your Honor, whether or not our rules are clear, petitioners here violated those rules. If they had looked at the 1994 Memorandum of Opinion and Order- But the rule was totality of the circumstances. The rule was totality of the circumstances. They argued that they reasonably relied on Bureau-level actions that were made without explanation, description, et cetera. What they ignored were warnings in the 1994 Memorandum of Opinion and Order, one of which, as I've already explained, said, if you have a put in combination with other terms in agreement that forces you to sell, we will find de facto control. And that's exactly what we found in paragraph 105 of the order. And petitioners don't dispute that. Again, all they do is go back to the Denali arrangement. And Denali is distinguishable because there were much smaller bids. The terms of the credit agreements were different. And they only could exercise their put after 10 years. So petitioners absolutely had fair notice here. Right? They chose not to follow it. And Baker Creek- let's talk about Baker Creek. Baker Creek set forth the six typical investor protections, right? Those investors like issuance of stock and major expenditures. They blew right past those as well. Right? There's nothing in there saying, you know, acquisition of spectrum is permissible. It's not. So even if you think that our rules are somewhat unclear, the guidance we did provide, they completely ignored. Can I ask, was the size of the bid dispositive? No, it was not dispositive, Your Honor. Again, I go back. The size of the bid affected the terms of the agreement. And I think the put, and I keep focusing on the put, but the put is the best example. How could these two companies, which are starting with nothing, and perhaps can't even build a network, required to provide service, to generate revenue, to pay back their loans, possibly pay back $10 billion plus interest in seven years.  And that's the contrast with Denali. In Denali, where you had a designated entity that had one regional license, had $274 million in net winning bids, partnered with an existing wireless provider, it could start building its network and providing service on day one, and had 10 years before it had to start paying back its loans. In that circumstance, you could plausibly find that that designated entity could keep its licenses. So it's really the $13 billion gross and the $10 billion net, right, in the context of the agreements here, that is the reason that we found a fact of control. But if they had purchased, say, $2 billion worth of Spectrum, would that have changed the calculation? It might have changed the analysis, but again, I think you would have to look at it in terms of the agreements. I think that's a closer case. But query whether, again, these two companies could repay $2 billion in seven years, particularly when they're not allowed to build a network. You know, petitioners on this interoperability restriction have never come in and said why they ceded their technology choice to DISH. I mean, if they want to be DISH's customer, that's fine, that makes sense. But why not at the get-go say, here's what we're going to deploy so they can get started, right, they can start generating revenue to pay back those loans. And we've never heard an answer from them. Thank you. Thank you. Three quick points, if I could, Your Honor. We'll give you two minutes. Thank you, I appreciate that. Respondent's counsel chose her words carefully when she said that the commission had never seen these terms before. The commission may not have because the Bureau decided 159 of the 164 applications, but the Bureau had seen those terms before. And that is our point. The second is, with respect to a cure, we could, I think, go back and forth all day on whether these provisions could or could not be altered in the way that, for example, ClearComm's provisions were significantly altered. But let me make the broader point, which is when FCC's counsel talks about creating a moral hazard, the way to avoid the moral hazard is, I think Judge Williams, you pointed this out, by giving fair notice of the standards. Future DE applicants certainly have fair notice of those standards because the commission has now issued a rule applicable to future auctions capping bidding credits, prohibiting joint bidding, among other things. But the question here is, did these petitioners have fair notice of that standard? Not whether their standard was reasonable, not whether it was understandable, but whether in these circumstances these petitioners had fair notice of the control standard that the commission uniquely, never before, decided to apply here. And that's a candid admission, I think, from the commission. The last of Respondent's counsel's statements that I want to draw your attention to, I think, is the crux of this case. Counsel said whether or not our rules were clear, the petitioners violated the rules. That's the point. Their rules were not clear. The control standards that were in place, that were articulated in the regulations, that were articulated in Baker Creek and Intermountain Microwave, and in all of those bureau precedents that the commission was constrained to disavow, were the standards that these DE applicants applied. They cannot be punished after the fact, after they have bid and won, for applying the control standard the bureau had applied so many times before. Ms. Flood said, I think, that petitioners here ignored the commission's warnings, and she described that they were specifically told that a put, in combination with other terms, that forces control would not pass muster. That is not completely correct, Your Honor. If you look at paragraph 95 of the Fifth Memorandum of Opinion and Order, which is the paragraph that Ms. Flood was referring to, what you'll find there is that the commission acknowledges that when you were talking about, again, investor protections, a put, which is held by the designated entity, actually retains control in the DE to essentially dictate the DE's fate. There are circumstances where a put in conjunction with very favorable terms, terms that force a sale at a certain point, might cross the line into control, but that, Judge Brown, just returns you back to all of those prior agreements, where a put was in conjunction with some other instances. So it's not an answer, I think, just to point to the put, which, again, is something the commission encouraged and understood, and to say, well, because there was a put here, that decides the case. And even if that is the case, that just gets you back to Judge Williams' point, which is then allow them to cure, allow them to come in and change the terms. And it's not an answer to say, well, they couldn't change all of the terms that we took issue with. First of all, these are the terms the Bureau did not take issue with many, many, many times before. Second of all, we never got the chance. In relying on prior precedent for the put, is Denali your best case? I think Denali is among the best cases, but going back to the Fifth Memorandum Opinion and Order itself, the reason the Fifth M.L.O. and O. spent so much time in those paragraphs I referred to earlier, 81, 94, 95, talking about the balance between protecting a major investor and control in the DE, is because in order to encourage a major investor to invest, the investor has to have some skin in the game over the long term. That's why puts are okay. That's why significant investor protections are okay. Any decision that affects the major investor is going to be approved. That's in the Fifth M.L.O. and O., not in those Bureau decisions, in the Memorandum Opinion itself. So even if the Commission could permissibly take issue with any of these standards, standards that the Commission had approved before, it should have given these DEs the opportunity to cure, and it didn't. It shouldn't have punished them in the first instance, and that should be the end of the story. But even if it could, it should have at least, as it has done every time before, which Respondents' Council didn't dispute, given them the chance to come back and cure, if there are no further questions. Thank you, Ron. Thank you.
judges: Brown, Pillard, Williams